**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MEDEVAC MIDATLANTIC, LLC** : | |
| **Plaintiff,** : | |
| **v.** : | **CIVIL NO. 10-1036** |
| : | |
| **KEYSTONE MERCY HEALTH PLAN,** : | |
| **Defendant.** : | |

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                   **August 31, 2011**

Before the Court is Defendant Keystone Mercy Health Plan's ("KMHP") Motion to

Dismiss and Strike Medevac MidAtlantic LLC's ("Medevac") Amended Complaint in Part [doc.

no. 25].  KMHP seeks to dismiss Counts I and II of Medevac's Amended Complaint under

Federal Rule of Civil Procedure 12(b)(6), and seeks to strike, under Rule 12(f), portions of

Plaintiff's Amended Complaint referencing "billed charges" and requesting attorneys' fees and

costs.[1]  Also pending is Medevac's Motion for Partial Summary Judgment, which the Court will

address by separate opinion and order.

Medevac's claims against KMHP, a managed care organization providing healthcare

---

[1]   The Court has subject matter jurisdiction over Counts I and III pursuant to 28 U.S.C. § 1331.
Medevac brings Count I pursuant to 42 U.S.C. § 1983 for KMHP's alleged violation of two provisions of
the Medicaid Act: 42 U.S.C. §§ 1396n(b)(4) and 1396u-2(f).  In Count III, Medevac seeks a declaratory
judgment that a provision of the Deficit Reduction Act of 2005, 42 U.S.C. § 1396u-2(b)(2)(D), does not
apply to Medevac.  Because the Parties are not diverse, see Am. Compl. ¶¶ 8 & 9, the Court has only
supplemental jurisdiction over the remaining state law claims (Counts II, IV, V & VI), pursuant to 28
U.S.C. § 1367(a).

1

services to Medicaid beneficiaries under the Commonwealth of Pennsylvania's HealthChoices

Medicaid plan, arise from KMHP's denial of partial or full payment to Medevac for the

emergency air transport services it has provided to KMHP's members.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Medicaid Program

Medicaid[2] is a cooperative federal-state program in which the federal government offers

funding to states that provide healthcare services to low-income individuals and families in

designated eligibility groups.[3]  Though state participation in Medicaid is voluntary, participating

states must comply with the requirements of the Medicaid Act and accompanying regulations,

including submission of a compliant state medical assistance plan for approval by the Secretary

of the U.S. Department of Health and Human Services, or risk losing federal funding.[4]  The

Medicaid Act requires that beneficiaries be permitted to receive healthcare services from

participating, qualified providers of their choice[5] (the "freedom-of-choice" provision), and that

the state pay those providers directly on a fee-for-service basis according to state-established fee

schedules.[6]  States may seek waivers from the requirements of that traditional fee-for-service

program.  In particular, states may seek a waiver of the "freedom-of-choice" provision to provide

---

[2]   Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, is known as the Medicaid Act. Sabree v. Richman, 367 F.3d 180, 182 (3d Cir. 2004).

[3]   Id. (citing Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d 531, 533 (3d Cir. 2002)).

[4]   Id. (citing 42 U.S.C. §§ 1396, 1396c and 42 C.F.R. § 430.10).

[5]   42 U.S.C. § 1396a(a)(23).

[6]   See 42 U.S.C. § 1396a(a)(30)(A) (payments to providers must be "consistent with efficiency, economy, and quality of care and . . . sufficient to enlist enough providers so that care and services are available under the plan . . . ."); see also 55 Pa. Code §§ 1101.61, 1150.61.

healthcare services to Medicaid beneficiaries through managed care systems.  In such systems, private contracting managed care organizations ("MCOs") administer the Medicaid program for their members, contract with a network of providers, arrange for care, and pay providers for their services.[7]  Medicaid beneficiaries enrolled in managed care plans receive care from only those providers designated by the MCO, except that emergency care providers cannot be restricted.[8]  Both the waiver itself and the contracts between MCOs and the state must be approved by the federal government,[9] and the contracts must comply with a series of statutory and regulatory requirements.[10]

In Pennsylvania, the Department of Public Works ("DPW") administers the state's Medicaid program[11] through both a traditional fee-for-service program and a managed care program—HealthChoices—which is mandatory for beneficiaries in some parts of Pennsylvania.[12]  Under HealthChoices, contracting MCO's receive payment on a capitated basis,[13] bearing the risk

---

[7]  See id. § 1396n(b).

[8]  Id. & § 1396u-2(b)(2).

[9]  Am. Compl. ¶ 53 (citing, *inter alia*, 42 U.S.C. § 1396b(m)(2)(A)(iii)); see also 42 C.F.R. §§ 438.806(b), 438.6.

[10]  See Am. Compl. ¶ 54; 42 U.S.C.§ 1396b(m).

[11]  Pennsylvania's medical assistance program is authorized under Article IV of Pennsylvania's Public Welfare Code, 62 P.S. §§ 401–488.  See 55 Pa. Code § 1101.11; see also 62 P.S. § 201(1).

[12]  See Hosp. & Healthsys. Ass'n of Pa. v. Dep't of Pub. Welfare, 888 A.2d 601, 603–04 (Pa. 2005); see also 55 Pa. Code § 1150.1.

[13]  "A 'capitated basis' . . . means that such services are provided for a flat rate based upon the number of participating individuals."  Hosp. & Healthsys. Ass'n of Pa., 888 A.2d at 604 n.3.

that the costs of service may exceed the capitation payments.[14]  The MCOs negotiate contracts with the providers that form the provider network.  Under such contracts, the MCOs direct their members to the network providers in exchange for receiving discounted rates for the medical services rendered to the members.[15]  Non-contracting providers furnishing services to an MCO's members are referred to as "out-of-network" or "non-plan" providers.[16]  Providers are not required to enter into a contract with an MCO.[17]

In 2006, Congress passed the Deficit Reduction Act of 2005,[18] effective January 1, 2007. Section 6085 of that Act amended the Medicaid Act to limit a Medicaid MCO's obligation to pay non-plan emergency providers:

> Any provider of emergency services that does not have in effect a contract with a Medicaid managed care entity . . . must accept as payment in full no more than the amounts . . . that it could collect if the beneficiary received medical assistance under this subchapter other than through enrollment in such an entity.[19]

Thus, non-plan emergency service providers[20] serving Medicaid enrollees are entitled to payment at only the rate they would receive under the state's fee-for-service Medicaid program.

---

[14]  Am. Compl. ¶ 19.

[15]  Am. Compl. ¶¶ 3, 22.

[16]  Hosp. & Healthsys. Ass'n of Pa., 888 A.2d at 604.

[17]  Am. Compl. ¶¶ 3, 20.

[18]  Pub. L. 109-171, 120 Stat. 4.

[19]  Id. § 6085, 120 Stat. 121 (codified as amended at 42 U.S.C. § 1396u-2(b)(2)(D)).

[20]  Whether "emergency services" includes air transport is the subject of Medevac's pending Motion for Partial Summary Judgment.

### B.      The Dispute

KMHP administers a Medicaid managed care program under a subcontract with Keystone Health Plan East, which holds a license issued by, and a prime contract with, DPW to serve as a private Medicaid MCO under the Commonwealth's HealthChoices program.[21]  KMHP receives payment based on a fixed fee per member, per month.[22]

Medevac provides emergency air transportation services from trauma scenes to medical facilities and between medical facilities.[23]  Though Medevac is not among KMHP's network providers and has no contract with KMHP,[24] KMHP cannot, under state and federal law, restrict its members from using Medevac's emergency services and is obligated under the contract with DPW to pay providers for medically necessary services, including emergency medical transportation services.[25]  Additionally, under Pennsylvania law, Medevac is obligated to provide its emergency transport services without regard to a patient's ability to pay.[26]

Medevac's claims arise from KMHP's alleged failure to adequately pay Medevac for emergency air transport provided to KMHP's members.  Medevac began providing emergency

---

[21]   Am. Compl. ¶¶ 9, 22.  KMHP is a joint venture between Keystone Health Plan East and Mercy Health Plan, each of which have 50 percent ownership of KMHP.  Am. Compl. ¶ 9.

[22]   Am. Compl. ¶ 2.

[23]   Am. Compl. ¶ 25.

[24]   Am. Compl. ¶ 30.  Medevac avers that ambulance services rarely participate in providers' networks because they receive most of their patient referrals from 911 call centers, and thus would benefit little from deeply discounting rates charged to HMOs in exchange for patient referrals.  Am. Compl. ¶¶ 28, 35.

[25]   Am. Compl. ¶¶ 23, 24, 29, 32.

[26]   Am. Compl. ¶ 26.

services to KMHP's members in April 2006, billing KMHP its usual and customary charges for emergency air transportation.[27]   Between April 2006 and fall of 2007, KMHP paid Medevac for half of the billed amount per service.[28]   Then, in fall 2007, KMHP began paying only 2% of billed charges per service.[29]   KMHP claimed that under Section 6085 of the 2005 Deficit Reduction Act, Medevac, as a non-network "emergency services" provider, was entitled to payment at only Pennsylvania's fee-for-service rates—which equated to 2% of Medevac's billed charges.[30]   Additionally, because KMHP determined that, at the 50% reimbursement rate, it had been significantly overpaying Medevac, it asserted the right to recoup nearly $300,000 in overpayments made since June 2006.[31]   Therefore, at some point after it asserted the applicability of Section 6085, KMHP ceased making any payments for Medevac's emergency air transport services provided to KMHP enrollees: Each time Medevac provided emergency air transport to KMHP's enrollees, rather than paying the bill, KMHP deducted from the total claimed overpayment an amount equal to the 2% of the billed charge for that particular transport service.[32]   For example, when Medevac transported a KMHP member and submitted a bill for $11,684 to KMHP, rather than paying the bill, KMHP reduced Medevac's overpayment balance

---

[27]   Am. Compl. ¶ 30, 33.

[28]   Am. Compl. ¶ 36.

[29]   Am. Comp. ¶¶ 37, 38.

[30]   Am. Compl. ¶ 38.  DPW's fee-for-service rates for emergency transport service are based on ground ambulance rates, not rates for emergency air transport.  Am. Compl. ¶ 14.

[31]   Am. Compl. ¶ 38–39 & Ex. A at 1.  This is so despite the Deficit Reduction Act's effective date of January 1, 2007.  Am. Compl., Ex. A. at 2.

[32]   Am. Compl. ¶ 39.

by $218—2% of the billed charges.[33]

### C.    Procedural History

Medevac filed a three-count complaint in the Philadelphia Court of Common Pleas,

bringing two state contract claims and a claim under the Pennsylvania Declaratory Relief Act.

KMHP removed that action to this Court, on grounds that the complaint contained an embedded

federal question, conferring jurisdiction on this Court.[34]   Medevac did not contest removal.[35]

After the Court ordered additional briefing as to why subject-matter jurisdiction was appropriate

under Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing, Inc.,[36] the

Parties stipulated that Medevac would be permitted to file an amended complaint,[37] and the Court

entered the stipulation.

Medevac's Amended Complaint brings six counts: (1) a claim under 42 U.S.C. § 1983 for

KMHP's violation of the timely payment provisions of the Medicaid Act; (2) a claim that KMHP

breached its contract with the state, to which Medevac is a third-party beneficiary, by failing to

make prompt payment to Medevac; (3) a claim under the federal Declaratory Judgment Act,

seeking judgment that Medevac is not a provider of emergency services under Section 6085 of

---

[33]   Am. Compl. ¶ 39.

[34]   Notice of Removal [doc. no. 1].

[35]   Pl. Medevac's Resp. to Def. KMHP's Notice of Removal [doc. no. 4].

[36]   545 U.S. 308 (2005).

[37]   Doc. no. 21.  This Court has subject-matter jurisdiction over this matter because, even if the original complaint was improperly removed due to lack of subject matter jurisdiction (a question this Court did not decide), Medevac's Amended Complaint, which states well-pleaded federal questions, confers subject-matter jurisdiction on this Court.  See In re Cmty. Bank of N. Va., 418 F.3d 277, 297 (3d Cir. 2005) (collecting circuit court cases).

the 2005 Deficit Reduction Act; (4) a claim for unjust enrichment, seeking payment for the reasonable value of Medevac's services; (5) a claim, in the alternative to Count IV, for breach of an implied-in-fact contract for KMHP's failure to continue remitting payment at the 50% rate agreed to by the Parties; and (6) a claim under Pennsylvania's declaratory relief statute seeking, *inter alia*, judgment that KMHP has no right to recoup the purported "overpayments."

KMHP now moves, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Section 1983 claim (Count I) and the state law claim for breach of a contract on a third-party beneficiary theory (Count II).  KMHP also moves, under Rule 12(f), to strike Medevac's requests for relief in the form of attorneys' fees and costs and reimbursement of "billed charges."[38]

## II.   STANDARD OF REVIEW

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court must accept a plaintiff's factual allegations as true and draw all logical inferences in favor of the non-moving party.[39]  Courts are not, however, bound to accept as true legal conclusions couched as factual allegations.[40]  The Complaint must set forth "direct or inferential allegations [for] all the material elements necessary to sustain recovery under some viable legal theory."[41]  And the plaintiff must allege "enough facts to state a claim for relief that

---

[38]   See Mem. of Law in Supp. of Def.'s Mot. to Dismiss & Strike Pl.'s Am. Compl. in Part ("KMHP Mem.") [doc. no. 25].

[39]   Phillips v. Cnty. of Allegheny, 515 F.3d 224, 230–31 (3d Cir. 2008); ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).

[40]   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).

[41]   See id. at 562 (citations and quotations omitted).

is plausible on its face."[42]

Rule 12(f) provides that a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."[43]  The purpose of the provision is to clean-up the pleadings, streamline the litigation and avoid inquiry into irrelevant matters.[44]  Motions to strike are to be decided on the pleadings alone.[45]

Though this Court has considerable discretion to grant or deny a motion to strike a pleading or portions thereof, such motions are highly disfavored, and even where a statement in a pleading falls within the four corners of Rule 12(f), a court should grant the motion only when "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues."[46]  In such cases, granting a motion may save resources of the court and parties by preventing litigation of claims that will ultimately not affect the outcome.[47]  Despite courts' distaste for striking pleadings and portions thereof, doing so is appropriate when the type or amount of relief sought is unavailable under law.[48]

---

[42] Id. at 570.

[43] Fed. R. Civ. P. 12(f).

[44] Zaloga v. Provident Life and Acc. Ins. Co. of Am., 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009).

[45] Id.

[46] N. Penn Transfer, Inc. v. Victaulic Co. of Am., 859 F. Supp. 154, 158 (E.D. Pa. 1994).

[47] Id.

[48] Siko v. Kassab, Archbold & O'Brien, L.L.P., No. 98-402, 1998 WL 464900, at *6 (E.D. Pa. Aug. 5, 1998).

III.   DISCUSSION

A.   **Motion to Dismiss Medevac's Section 1983 Claim.**

Under 42 U.S.C. § 1983, plaintiffs may seek relief against anyone who, under color of state law, deprives them of rights, privileges, or immunities secured by the Constitution and federal laws.[49]  In Count I, Medevac brings claims under 42 U.S.C. § 1983, alleging KMHP, acting under color of state law, violated Medevac's right to timely payment under 42 U.S.C. §§ 1396n(b)(4) and 1396u-2(f), which are among the waiver and managed care provisions of the Medicaid Act.  KMHP moves to dismiss Count I because, KMHP asserts, the relevant Medicaid provisions confer no enforceable federal rights on Medevac, and KMHP is not acting under color of state law.

Section 1983 provides a remedy for deprivation of rights secured by federal statute, not for violations of federal law.[50]  Thus, the Court must determine not whether Medevac adequately alleges that KMHP violated Sections 1396n(b)(4) and 1396u-2(f), but whether those provisions confer on Medevac individual federal rights enforceable under Section 1983.

To evaluate that question, the Third Circuit directs that courts first determine whether the three requirements set forth by the Supreme Court in Blessing v. Firestone[51] are satisfied: (1) Congress must have intended that the statute benefit the plaintiff; (2) the benefit provided must not be "vague and amorphous;" and (3) the statute must impose an "unambiguous and

---

[49]   Sabree v. Richman, 367 F.3d 180, 181 n.2 (3d Cir. 2004).

[50]   Id. at 181 n.2 & 188; Grammer v. John J. Kane Reg. Ctrs.-Glen Hazel, 570 F.3d 520, 525 (3d Cir. 2009).

[51]   520 U.S. 329 (1997).

binding obligation" on the state.[52]  If the <u>Blessing</u> test is met, courts then determine, based on the statute's text and structure, whether "Congress unambiguously conferred the rights asserted," by using "rights-creating terms."[53]  Rights-creating terms are those that "clearly impart an individual entitlement and have an unmistakable focus on the benefitted class."[54]

In a series of non-Medicaid cases, the Supreme Court has provided general principles guiding the determination of whether a statute uses rights-creating language and confers an individual, enforceable right.  In <u>Gonzaga University v. Doe</u>,[55] the Court identified as quintessential rights-conferring language that set forth in Titles VI of the Civil Rights Act and IX of the Education Act Amendments of 1972: "no person . . . shall . . . be subjected to discrimination."[56]  It then held that the educational records' privacy provision of the Family Educational Rights and Privacy Act did not confer on students an individual right to privacy of their records because it addressed the obligation of the Secretary of Education to deny funding to schools releasing records without students' consent.[57]  Though the provision mentioned students and the need for consent, because it spoke "only in terms of institutional policy and practice, not *individual* instances of disclosure," and had an "aggregate focus," rather than a focus on of any

---

[52]   <u>Sabree</u>, 367 F.3d at 186 (citing <u>Blessing</u>, 520 U.S. at 340–41) (quotations omitted).

[53]   <u>Id.</u> at 190 (citing <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 283, 284 (2002)) (quotations omitted); <u>see</u> <u>also</u> <u>Grammar</u>, 570 F.3d at 527.

[54]   <u>Sabree</u>, 367 F.3d at 187 (citations and quotations omitted).

[55]   536 U.S. 273 (2002).

[56]   <u>Id.</u> at 284 & n.3, 287.

[57]   <u>Id.</u> at 287.

particular individual, it did not confer individual rights.[58]  Similarly, statutory provisions that

provide benefits to individuals by imposing generalized duties on a participating state generally

do not confer enforceable individual rights.  For example, in <u>Suter v. Artist M.</u>,[59] a statutory

requirement that states receiving federal funding to provide foster care and adoption services

make "reasonable efforts" to avoid the need to remove a child from his home and to make family

reunification possible after placement in foster care did not confer individual rights on children

because the "reasonable efforts" provision imposed only generalized duties on the state.[60]  And in

<u>Blessing</u>, a statutory requirement that states receiving child-welfare funds must "substantially

comply" with requirements to ensure timely payment of child support did not confer on plaintiff-

mothers an enforceable right to state assistance in obtaining support payments because the

"substantial compliance" provision focused on the state's aggregate duties, rather than on the

needs of an individual parent; the substantial compliance requirement functioned "'simply [as] a

yardstick for the Secretary to measure *systemwide* performance of the State's . . . program.'"[61]

        In the Medicaid context, both the Third Circuit and the Supreme Court have held that

certain provisions of the Medicaid Act create enforceable individual rights of providers or

beneficiaries.  In <u>Wilder v. Virginia Hospital Association</u>,[62] the Supreme Court held that Section

---

[58]  <u>Id.</u> at 288 (emphasis added).

[59]  503 U.S. 347 (1992).

[60]  <u>Id.</u> at 358, 363.

[61]  <u>Gonzaga</u>, 536 U.S. at 281 (discussing and quoting <u>Blessing v. Firestone</u>, 520 U.S. 329, 343 (1997) (emphasis in original).

[62]  496 U.S. 498 (1990).

1396a(a)(13)(A), which required that a state Medicaid plan "must provide . . . for payment . . . of [medical services] though the use of rates . . . [that] are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities"[63] could be enforced by providers.[64]  Critical to that finding was the statute's emphasis on tying reimbursement rates to providers' costs, creating an unmistakable focus on providers' needs.[65]  Similarly, the Third Circuit, in Sabree v. Richman,[66] found that Sections 1396a(a)(8), (a)(10), and (a)(15) of the Medicaid Act conferred on developmentally disabled Medicaid beneficiaries an enforceable right to reasonably prompt medical assistance in an intermediate care facility ("ICF").[67]  The statutory provisions required that a state "must provide . . . medical assistance . . . to . . . all eligible individuals" with "reasonable promptness," and included treatment at ICFs as a type of medical assistance.[68]  Sabree found that the plaintiffs with developmental disabilities had an enforceable right because they were the intended beneficiaries of the provisions, the rights conferred were specific and enumerated, the obligation was unambiguous and binding, and the statutory terms ("must provide . . . to all eligible individuals") were both mandatory and had an unmistakable

---

[63]   This provision has since been repealed.  See Pa. Pharmacists Ass'n v. Houstoun, 283 F.3d 531, 536–37 (3d Cir. 2002) (en banc).

[64]   Wilder, 496 U.S. at 510–12.

[65]   See Pa. Pharmacists Ass'n, 283 F.3d at 538, 542–43 (discussing Wilder v. Va. Hosp. Ass'n, 496 U.S. 498 (1990)).

[66]   367 F.3d 180 (3d Cir. 2004).

[67]   Id. at 192.

[68]   Id. at 189.

individual focus, rather than a focus on the regulated entity.[69]

The statutory language the Court must evaluate here falls somewhere between the boundaries outlined by these cases.  Although the language of Sections 1396n(b)(4) and 1396u-2(f) appears to be similar to that found to create an enforceable individual right in Wilder and Sabree, both Sections define the purported "right" to timely payment by reference to Section 1396a(a)(37)(A), which speaks more in terms of institutional policy and practice with an aggregate focus, as in Gonzaga, Suter, and Blessing.  Consequently, the Court must determine whether these sections, considered *together*, confer on Medevac an individual enforceable right.

Section 1396n(b)(4) allows the Secretary to waive the freedom-of-choice requirement to permit states to implement a plan that restricts providers if certain other conditions, including timely payment to providers, are satisfied.  The provision states:

> The Secretary . . . may waive such requirements of section 1396a of this title . . . as may be necessary for a State . . . to restrict the provider from (or through) whom an individual . . . can obtain services (other than in emergency circumstances) to providers or practitioners who undertake to provide such services and who meet, accept, and comply with the reimbursement, quality, and utilization standards under the State plan . . . if such restriction does not discriminate among classes of providers on grounds unrelated to their demonstrated effectiveness and efficiency in providing those services and if providers under such restriction are paid on a timely basis in the same manner as health care practitioners must be paid under section 1396a(a)(37)(A) of this title.[70]

Section 1396u-2 imposes certain requirements on states that opt to provide Medicaid

---

[69]   Id. at 189–90.

[70]   42 U.S.C. § 1396n(b)(4).  The Court questions whether § 1396n(b)(4) is applicable to Medevac's emergency services because such services by the terms of this section, cannot be restricted.  The "timely basis" provision applies only to "restricted providers."  But because assuming that this provision applies to emergency services providers does not affect the outcome, the Court does so here.

services through contracts with MCOs and require beneficiaries to enroll with those MCOs.[71]

Section 1396u-2(f), entitled "Timeliness of payment," provides:

> A contract . . . with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan . . . who are enrolled with the organization on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule.[72]

Medevac argues, with some force, that the language in these subsections ("shall provide," "shall make payment to health care providers . . . on a timely basis," and "may waive . . . if providers under such restriction are paid on a timely basis") mimics the language that Sabree found conferred an enforceable right.  First, the provisions providing for timely payment to providers appear intended to benefit providers.  Such a provision would not benefit eligible Medicaid recipients because Medicaid recipients, in most cases, are not obligated to pay the provider directly; failure to timely pay providers would not impose payment liability on them.  Moreover, timely payment by MCOs would not necessarily benefit the state or MCOs against whom the requirement is imposed.  And though, arguably, such a provision benefits the Medicaid program as a whole by ensuring providers are not discouraged from participating in the state's plan, the direct benefit to providers is unmistakable.  Second, just as "reasonable promptness" was found to be sufficiently definite in Sabree, so too would be a requirement for payment on a "timely basis."  Third, the language is mandatory: under 1396u-2(f) a contract *shall* provide that

---

[71]   42 U.S.C. § 1396u-2(a)(1)(A).

[72]   42 U.S.C. § 1936u-2(f).

payment *shall* be made on a timely basis, and under 1396n(b)(4), a waiver may only be granted if providers are to be paid on a timely basis. Thus, the requirements of the Blessing test are satisfied. And, pursuant to Gonzaga, the language of both provisions focuses specifically on providers and the conditions of their payment under a waiver or managed care contract, not on institutional policies or practices, or on the program in the aggregate.[73] Reinforcing the focus on providers, Section 1396n(b)(4) establishes reciprocal rights and obligations of participating providers: restricted providers that "meet, accept, and comply with the reimbursement, quality, and utilization standards under the State plan" are entitled to non-discriminatory treatment and payment on a timely basis. Thus, facially, the provisions use rights-creating language and therefore appear to confer an enforceable individual right to timely payment on healthcare providers.

But that does not end the inquiry. The requirement that payment to providers be "timely" is qualified: payment must be timely made "consistent with" or "in the same manner" as provided under section 1396a(a)(37)(A). That section provides that a state Medicaid plan must provide for "claims payment procedures" that:

> [E]nsure that 90 per centum of claims for payment (for which no

---

[73]   At least one court has concluded that Section 1396n(b)(4) is focused not on providers, but instead on the Secretary because it provides guidance to the Secretary about when waivers *may* be granted and does not mention providers in "imperative terms." See Molina Healthcare of Ind., Inc. v. Henderson, No. 06-1483, 2006 WL 3518269, at *15 (S.D. Ind. Dec. 4, 2006). This Court disagrees. First, the provision makes clear that *if* a waiver is granted, providers *must* be timely paid in accordance with 1396a(a)(37)(A). Thus, when the Secretary has used its authority to grant a waiver, the conditions of this subsection must be satisfied. Second, Congress has directed that a "provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a state plan or specifying the required contents of a state plan." 42 U.S.C. § 1320a-2. This Court concludes that Molina did precisely that. Section 1396n(b)(4) effectively establishes requirements for state plans that restrict providers, and thus should not be deemed unenforceable *solely* on the basis that it guided the Secretary's approval of a waiver.

further written information or substantiation is required in order to
make payment) made for services covered under the plan and
furnished by health care practitioners through individual or group
practices or through shared health facilities are paid within 30 days of
the date of receipt of such claims and that 99 per centum of such
claims are paid within 90 days of the date of receipt of such claims .
. . .[74]

The language of this provision stands in stark contrast with the facially provider-focused

language of Sections 1396n(b)(4) and 1396u-2(f).  First, it does not focus on payment to

individual providers, but rather on a state's institutional payment *procedures* to ensure timely

payment of claims in the *aggregate*, along the lines of the statutory language in Gonzaga, Suter,

and Blessing.  The requirement that a certain percentage of claims be paid within 30 or 90 days

appears to serve as a benchmark for the performance of the claims procedures;[75] it does not

require that all providers be paid within these time frames.  In fact, Section 1396a(a)(37)(A)

expressly anticipates that some claims will *not* be paid within the 30 or 90 day periods, and

applies only to claims for which no further documentation is required.  Further, the focus on

"claims" and the "procedures" to ensure their payment, rather than on providers, suggests the

intent is to ensure efficient administration of undisputed claims—a process that benefits the

Medicaid program as a whole.  Providers are mentioned, but only indirectly ("claims for payment

. . for services . . . furnished by [providers]").  And while providers surely benefit from the

provision, under Gonzaga, congressional intent to benefit a class is insufficient.  Moreover, the

provision frames the state's obligation based on payment of claims in the *aggregate*, suggesting

---

[74]  42 U.S.C. § 1396a(a)(37)(A).

[75]  See Blessing, 520 U.S. at 343.

no individual provider is entitled to timely payment.[76]  Thus, unlike Wilder and Sabree where the relevant provisions not only mentioned providers and beneficiaries, but also emphasized the needs of *all* beneficiaries or *individual* providers and beneficiaries,[77] Section 1936a(a)(37)(A) does not reference providers in such terms.  The Court thus concludes, as others have before it,[78] that because Section 1396a(a)(37)(A) "speak[s] only in terms of policy and practices not individual instances of [payment],"[79] it does not confer individual enforceable rights on providers.

---

[76]  Contrary to Plaintiff's suggestion, this case thus stands in contrast to Grider v. Keystone Health Plan, Central, Inc., No. 01-5641, 2003 WL 22182905 (E.D. Pa. Sept. 18, 2003), in which the court concluded that a state-law requirement that a managed care plan "shall pay a clean claim submitted by a health care provider within forty-five (45) days of receipt of the clean claim," conferred a state-law private right of action on providers. Id. at *30–32  That provision explicitly focuses on the individual provider and its *individual* right to payment within a specific time period, and imposed interest penalties for failure to do so at Id. at *30 n.44.  It did not, like Section 1396a(a)(37)(A), establish time frames for payment of claims for the program in the aggregate or focus on the requirement for procedures to meet those benchmarks.

[77]  In Wilder, the Supreme Court found that providers had individual enforceable rights because of the emphasis of the statutory text on individual facilities' costs for providing care; thus the provision "measured the adequacy of payments in relation to the economics of providers." Pa. Pharmacists, 283 F.3d at 537 (discussing Wilder v. Va. Hosp. Ass'n, 496 U.S. 498 (1990)).  And in Sabree, the relevant provision required that medical assistance be provided to "all [eligible] individuals."  Sabree, 367 F.3d at 189 (alteration in original).

[78]  See Bio-Medical Applications of N.C., Inc. v. Elec. Data Sys. Corp., 412 F. Supp. 2d 549, 553 (E.D.N.C. 2006) ("Rather than focusing on the individual, the language of these Medicaid provisions [including 1396a(a)(37)(A)] is akin to the type of institutional policy and practice language that the Supreme Court specifically found did not support a finding of Congressional intent to create individual rights."); Patients' Choice Med. Ctr. of Humphries Cnty., LLC v. Office of the Governor, No. 08-696, 2009 WL 531861, at *4 (S.D. Miss. Mar. 3, 2009) (holding that because 1396a(a)(37)(A) "speaks only in terms of institutional policy and practice, has an aggregate rather than individualized focus and is not concerned with whether the needs of any particular person or class of individuals have been satisfied, it does not appear to create a private right enforceable under § 1983") (citation and quotations omitted).

[79]  See Gonzaga, 536 U.S. at 288; see also Pa. Pharmacists Ass'n, 283 F.3d at 537–38 (provisions regarding methods and procedures were intended to benefit the efficiency and economics of the program and patients).

Having concluded that Sections 1396n(b)(4) and 1396u-2(f), at least facially, use rights-creating language, and that Section 1396a(a)(37)(A) does not, the Court must determine the impact of the prior two sections' reliance on the latter.  Because the purported rights to timely payment in 1396n(b)(4) and 1396u-2(f) are defined only in terms of aggregate performance and procedural requirements in 1396a(a)(37)(A), they do not confer on providers enforceable individual rights to timely payment.  The only right enforceable under Sections 1396n(b)(4) and 1396u-2(f) that the Court can discern is the right to compel compliance with those procedural requirements.[80]  Thus, if procedures were so inadequate that the state was not hitting the benchmarks for timely payment, individual (or groups of) providers may have enforceable rights to ensure compliance with the benchmark.[81]  But here, Medevac complains only that it has not been timely paid by KMHP within the time frames under Section 1396a(a)(37)(A), not that the state has failed to meet the aggregate timely payment requirements.

Medevac does not dispute that Section 1396a(a)(37)(A) lacks rights-conferring language; instead it insists that Section is irrelevant to this Court's inquiry because sections 1396n(b)(4) and 1396u-2(f) create stand-alone timely payment rights.  But the right to payment in these sections is only a right to payment in the same manner or consistent with the timely payment

---

[80]   The Court recognizes that the district court in National Medical Care, Inc. v. Rullán, No. 04-1812, 2005 WL 2878094, at *8 (D.P.R. Nov. 1, 2005), reached the opposite conclusion, finding that Section 1396a(a)(37)(A) used rights-creating language by identifying "healthcare practitioners" as a discrete class of beneficiaries.  It did not, however, consider the implications of the emphasis on claims payment procedures and the aggregate performance benchmark.  Accordingly, this Court does not find National Medical Care persuasive.

[81]   See Wilder, 496 U.S. at 527–28 (Rehnquist, J. dissenting) ("[E]stablishment of rates in accordance with that process [for establishing reasonable rates] is the only discernible right accruing to anyone under § 1396a(a)(13)(A).").

provisions applicable to health care practitioners—the only providers referenced in

1396a(a)(37)(A).  The limited legislative history available suggests that Congress was attempting

to extend the reach of Section 1396a(a)(37)(A) to all types of providers, not to create additional

rights for providers offering services under a managed care system.

For example, in 1990, Congress amended the Medicaid Act to add Section 1396n(b)(4)[82]

when it recognized that although the statute provided for timely payment to healthcare

practitioners, it had no such provision for hospitals and other providers.[83]  Section 1396n(b)(4)

thus "extend[ed] the prompt payment requirements to any type of provider participating under a

selective contracting waiver."[84]  Similarly, Congress later extended those provisions to providers

of services subject to a state's contract with an MCO.[85]  Nothing in the legislative history

suggests that Congress intended to create *new* or *greater* rights to payment than were afforded

under Section 1396a(a)(37)(A) to healthcare practitioners operating under traditional state

Medicaid programs.

Accordingly, the Court finds that Medevac has not stated a § 1983 claim because neither

of the statutory provisions it seeks to enforce confers on providers individual enforceable rights

---

[82]   See Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, § 4742 ("Timely Payment Under Waivers of Freedom of Choice of Hospital Services"), 104 Stat. 1388-197 (1990) (codified at 42 U.S.C. § 1396n(b)(4)).

[83]   See H.R. Rep. No. 101-964 at 882 (1990) (Conf. Rep.) ("Medicaid Law includes requirements that states pay health care practitioners, such as physicians, on a timely basis, but includes no such provision for other types of providers, such as hospitals.").

[84]   See id. at 888.

[85]   See Balanced Budget Act of 1997, Pub. L. 105-33, § 4708(c) 111 Stat. 506 (1997) (codified at 42 U.S.C. 1396u-2(f)).  Notably, Section 4708 of the Act was entitled "Improved Administration," supporting a finding that the intent of timely payment provisions is to ensure the efficient administration of state Medicaid programs, rather than to confer an individual right on providers.

to timely payment.  Having so concluded, the Court does not reach the question of whether KMHP acts under color of state law.

**B.      Motion to Dismiss Medevac's Third-Party Beneficiary Claim.**

The Operating Agreement between Keystone Health Plan East and DPW requires KMHP, as a subcontractor, to make timely payment to non-plan emergency providers.[86]  Based on this provision, Medevac brings a breach-of-contract claim on a third-party beneficiary theory.  KMHP moves to dismiss because the Operating Agreement explicitly disclaims intent to create third-party beneficiaries.

Under Pennsylvania law, a contract creates a third-party beneficiary when its language affirmatively indicates mutual intent to benefit that third-party.[87]  Pennsylvania has also adopted, as an exception to that general rule, Section 302 of the Restatement (Second) of Contracts, under which a contract can create a third-party beneficiary even in the absence of language demonstrating mutual intent.[88]  Section 302 provides:

> (1) *Unless otherwise agreed between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

---

[86]  See Am. Compl. ¶¶ 18, 71, 72.

[87]  See Spires v. Hanover Fire Ins. Co., 70 A.2d 828, 831 (Pa. 1950) overruled in part by Guy v. Liederbach, 459 A.2d 744 (Pa. 1983).  Guy established that the third-party beneficiary test set forth in Spires was not the exclusive means of determining whether a third-party beneficiary was intended.  Guy, 459 A.2d at 751.

[88]  Scarpitti v. Weborg, 609 A.2d 147, 150–51 (Pa. 1992) (citing Guy, 459 A.2d at 751).

> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

> (2)  An incidental beneficiary is a beneficiary who is not an intended beneficiary.[89]

In analyzing Section 302(1) at step one,[90] Pennsylvania courts require that the circumstances surrounding the contract be "compelling" before finding that recognizing a third-party beneficiary is appropriate to effectuate the intention of the parties.[91]  At step two, there must be a showing that the alleged beneficiary falls within one of two categories under Section 302(1)(a) and (b)—creditor and donee beneficiaries.[92]  "If the two steps of the test are met, the beneficiary is an intended beneficiary unless otherwise agreed between the [contracting parties]."[93]

Here, the Operating Agreement expressly disclaims any intent to create third-party beneficiaries, unambiguously stating: "This Agreement does not, nor is it intended to, create any rights, benefits or interest to any third party, person or organization."[94]  Generally, a contract that

---

[89]   Restatement (Second) of Contracts § 302 (1981) (emphasis added).

[90]   Whether recognizing the right is appropriate to effectuate the intent of the parties is a question of standing for courts to decide.  See Guy, 459 A.2d at 751.

[91]   Scarpitti, 609 A.2d at 150–51 (citation and quotations omitted).

[92]   Id.

[93]   Guy, 459 A.2d at 751 (quotations omitted).

[94]    KMHP Mem. at 17 & Ex. 1 at 160.

The court may consider the Operating Agreement because, though it was not attached to the Amended Complaint, Medevac's Amended Complaint, at paragraph 70, relies on the Agreement.  Lum v. Bank of Am., 361 F.3d. 217, 222 n.3 (3d Cir. 2004) (in deciding a 12(b)(6) motion to dismiss, a court may consider exhibits attached to the complaint and documents that form the basis of the claim; a document forms the basis of the claim if it is integral to or explicitly relied upon in the complaint), abrogated in part on other grounds by Twombly v. Bell Atl. Corp., 550 U.S. 544 (2007) as recognized in In re Ins. Brokerage Antitrust Litig., 618 F.3d 300 (3d Cir. 2010).  Both Medevac and KMHP attached

expressly disclaims intent to create third-party beneficiaries cannot also be read as expressly

evincing an intent to create beneficiaries.[95]  Even under Section 302's implied intent exception,

the circumstances underlying the contract give rise to intended beneficiary status only if the

parties have not "otherwise agreed."[96]  And Pennsylvania courts ordinarily give effect to such

disclaimers when considering Section 302.[97]

---

excerpts of the Agreement to their motion papers.  KMHP Mem., Ex. 1; Medevac Resp., Ex. D.

[95]  See R.M. Shoemaker v. Se. Pa. Econ. Devel. Corp., 419 A.2d 60, 63 (Pa. Super. Ct. 1980) (finding loan agreement that expressly disclaimed intent to create third-party beneficiaries made it "abundantly clear" that contracting parties did not intend contract to confer rights on contractor); Gee v. Eberle, 420 A.2d 1050, 1055 n.4 (Pa. Super. Ct. 1980) (finding express disclaimer defeated third-party beneficiary claim despite other contract language from which intent to benefit claimant could be inferred); Gannon v. Baldt Anchor & Chain, 459 F. Supp. 457, 459 (E.D. Pa.) (finding employee was not third-party beneficiary of collective bargaining agreement when agreement expressly excluded employee in plaintiff's category), aff'd 588 F.2d 820 (3d Cir. 1978) (table case).

[96]  Guy, 459 A.2d at 751.

[97]  See Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa., 7 A.3d 278, 287–88 (enforcing express disclaimer stating neither subcontractors nor any other party was a third party beneficiary of the loan agreement though bank retained right to make payment directly to subcontractors); Mar-Paul Co. v. Jim Thorpe Area Sch. Dist., No. 04-2595, 2008 WL 6478564 (Pa. Com. Pl. July 31, 2008) (exculpatory provision eschewing any other contractual beneficiaries was dispositive to third-party beneficiary claim); Tredennick v. Bone, 647 F. Supp. 2d 495, 498–99 (W.D. Pa. 2007) ("Because the parties . . .explicitly provided that no third parties could rely on the tax advice . . . provided [under the contract], plaintiff cannot successfully claim to be a third party beneficiary), aff'd 323 F. App'x.103 (3d Cir. 2008); Banknorth, N.A. v. BJ's Wholesale Club, Inc., 442 F. Supp. 2d 206, 210–11 (M.D. Pa. 2006) (because parties "otherwise agreed" by including third-party disclaimer clause in contract, Section 302 was unavailable); Evans Suppliers & Commc'ns Co. v. Elliott-Lewis Corp., No. 0469, 2005 WL 1793497, at *2 (Pa. Com. Pl. July 27, 2005) (finding minority subcontractor was not intended beneficiary under Section 302 where contract expressly disclaimed third party beneficiaries); Villanova, Ltd. v. Convergys, No. 01-1213, 2001 WL 868662, at *1–2 (E.D. Pa. Apr. 24, 2001) ("[B]ecause the parties to the contract explicitly provided that there were to be no third party beneficiaries, [plaintiff] cannot successfully claim to be one."); Altoona City Auth. v. L. Robert Kimball & Assocs., No. 1321, 1995 WL 870770, at *5 (Pa. Com. Pl. May 26, 1995) ("The . . . agreement cannot meet the test of section 302 since it cannot meet the threshold requirement which permits the court to consider section 302 only where there is no "agreement otherwise" between promisor and promisee."); Meyers Plumbing & Heating Supply Co. v. W. End Fed. Sav. & Loan Ass'n, 498 A.2d 966, 969 (Pa. Super. Ct. 1985) (no-lien provision in contractor warranty indemnifying property owners, and additional non-lien agreement, manifested the owners' intent to protect themselves from claims of subcontractors).

Medevac argues that the disclaimer must be disregarded because it contradicts the more specific contract provisions that evince mutual intent to benefit emergency services providers, and courts must give effect to the specific over the general.[98]   Medevac presents two contract provisions that it contends demonstrate intent to benefit emergency services providers.  First, Section V.A.9 of the Operating Agreement requires KMHP to comply with certain program standards, including the obligation to pay for emergency services "in accordance with applicable law," with "applicable law" defined to include all of the provisions of the Pennsylvania Quality Health Care Accountability and Protection Act.[99]   Among that Act's provisions is a requirement to pay emergency health care providers for the costs of medically necessary emergency services.[100]   Second, Section VII.D.6 of the Agreement requires KMHP to timely pay non-plan emergency providers for medically necessary services rendered to treat an emergency medical condition.[101]

The Court does not agree that these contract provisions demonstrate mutual intent to benefit Medevac and other providers in its situation.  A fair reading of the relevant contractual provisions in the context in which they appear lead this Court to conclude that they evince intent to impose on KMHP an obligation to comply with applicable law, not an intent to specifically benefit emergency services providers.  State contracts with Medicaid MCOs must provide for

---

[98]   Medevac Resp. at 17.

[99]   Medevac Resp. at 16 & Ex. D at 27, 34, Ex. K.

[100]   40 P.S. § 991.2116.

[101]   Medevac Resp., Ex. D at 127.  This same provision requires the MCO to "assume financial responsibility, *in accordance with applicable law*, for emergency services and urgently needed services" that are obtained outside the provider-network, regardless of prior authorization.  Id. (emphasis added).

timely payment to providers,[102] and Pennsylvania law requires HMOs to pay for medically necessary emergency services provided by non-plan providers.[103]  Contractual provisions ensuring compliance with existing statutory or regulatory provisions do not indicate mutual intent to benefit a non-party; they evince intent to comply with applicable law.[104]  Indeed, the Operating Agreement requires the MCO to comply with *all* regulations promulgated under the Medicaid Act, as well as with a number of federal and state laws.[105]  Under Medevac's construction, every beneficiary of the many applicable federal and state statutes referenced in the contract would have the right to sue the MCO for non-compliance, creating expansive liability under the contract, despite the disclaimer.

Medevac also argues that, under Pennsylvania law, express disclaimers are not dispositive of third-party beneficiary status.  While that is true, situations in which disclaimers are not given effect are rare.  Pennsylvania courts appear to disregard express disclaimers only where the purported third-party beneficiaries were the sole or primary beneficiaries of the contract's

---

[102]   42 U.S.C. § 1396u-2(f).

[103]   40 P.S. § 991.2116.

[104]   See Evans Suppliers, 2005 WL 1793497 at *2 & n.3 (finding minority subcontractor was not intended beneficiary where subcontractor was specifically named in the contract in compliance with applicable laws and contract expressly disclaimed third party beneficiaries).

[105]   Medevac Resp., Ex. D at 27 ("The PH-MCO agrees to comply with all applicable rules, regulations, and Bulletins promulgated under . . . 42 U.S.C. § 1396 et seq. . . .").  In addition to complying with all the provisions of Pennsylvania's Health Care and Accountability Act of 1998, the PH-MCO must also comply with provisions of the Civil Rights Act, Title IX of the Education Amendments, portions of the Rehabilitation Act, the Americans with Disabilities Act; and the Pennsylvania Human Relations Act.  See Medevac Resp., Ex. D at 27.

performance.[106]  In such circumstances, recognizing the intended beneficiary is necessary to give

effect to the intent of the parties to provide that benefit.  The circumstances that Medevac

presents here are not so compelling.  Medevac does not contend the purpose of the contract is to

benefit emergency providers or providers as a whole.  Instead, it argues that direct payment to

providers is an essential component to successful implementation of the Medicaid managed care

program because the program depends on DPW making capitation payments to KMHP in

exchange for KMHP's direct payment to providers, which also ensures Medicaid recipients are

held harmless.  That may be so, but it does not present compelling circumstances that suggest

recognizing Medevac's right here is appropriate to effectuate the intent of DPW and KMHP *to

benefit Medevac*.[107]  Instead, direct payment to providers, like many other provisions of the

contract, help effectuate the parties' intent *to implement a Medicaid managed care program* for

the benefit of eligible Medicaid recipients.  Medevac is thus an incidental, not intended,

---

[106]  See Ario v. Reliance Ins. Co., 981 A.2d 950, 963–68 (Pa. Commw. Ct. 2009) (concluding
that third-party beneficiary disclaimer in reinsurer's contract with insurer did not bar a finding that
hospital insureds were intended beneficiaries where circumstances of the contract's performance and
related documents demonstrated that reinsurer functioned as the primary insurer of the hospitals and
enforcing the disclaimer would have up-ended the entire contractual relationship); State Farm Mut. Auto.
Ins. Co. v. HHS Assocs., No. 93-5943, 1995 WL 739703, at *1 (E.D. Pa. Dec. 1, 1995) (concluding that
because evidence suggested that contracting parties knew that the subject matter of the contract—an
environmental assessment of a property to be purchased by plaintiff—was undertaken solely for
plaintiff's purposes as a buyer, a genuine issue of fact remained as to whether plaintiff was intended
beneficiary).

[107]  See Scarpitti, 609 A.2d at 151 (compelling circumstances existed where contract between
developer and architect under which architect enforced subdivision restrictions benefitted only
homeowners); Guy, 459 A.2d at 751–52 (finding enforcement of testator's contract with attorney by non-
party legatee appropriate to effectuate testators intent to benefit legatee and attorney's intent to draft will
to carry out testator's intent); Guerra v. Springdell Vill. Homeowners Ass'n, No. 11-200, 2011 WL
1303360, at *2–3 (E.D. Pa. Apr. 6, 2011) (noting compelling circumstances exception is a narrow one,
and finding no compelling circumstances existed though plaintiff was among the beneficiaries of a snow
removal contract with homeowners association, she was not the sole beneficiary) (citing Scarpitti, 609
A.2d at 151).

beneficiary.

Medevac also argues that a provision in the Agreement specifying that the Bureau of Hearings and Appeals is not the appropriate forum to resolve provider disputes with MCOs indicates the parties' intent that providers may "directly enforc[e] their payment rights arising under the Operating Agreement."[108]   The Court does not find this provision is inconsistent with the disclaimer or that it presents circumstances so compelling that recognition of Medevac's beneficiary status is appropriate.   That the Bureau of Hearings and Appeals will not entertain disputes does not demonstrate intent to permit direct enforcement by third parties because the parties could have anticipated means other than direct enforcement of the contract to resolve such disputes: network providers can enforce their rights directly against KMHP pursuant to their own contracts and non-network providers may bring other state law claims, as Medevac has alleged here.[109]   Moreover, DPW itself can enforce the contract to effectuate the parties' intent. Accordingly, the Court concludes that Medevac has not alleged circumstances sufficient to overcome the express disclaimer in the Operating Agreement.[110]

Finally, Medevac has not pleaded facts sufficient to enforce a *government* contract as a third-party beneficiary, particularly in light of the disclaimer.   Pennsylvania courts have adopted

---

[108]   Medevac Resp. at 18 & Ex. D at 68.

[109]   See Guy, 459 A.2d at 747 (noting that "the grant of standing to a narrow class of third party beneficiaries seems 'appropriate' under Restatement (Second) of Contracts §302 where the intent to benefit is clear and the promisee . . . is unable to enforce the contracts"); Altoona City Auth., 1995 WL 870770 at *5 (Section 302 applies where a third party beneficiary would be "without recourse or for some compelling reason").   But see Scarpitti, 609 A.2d at 152 & n.2 (noting in dicta that the presence of an alternative remedy does not preclude one from being a third party beneficiary).

[110]   While arguably other factual circumstances might exist that demonstrate compelling circumstances, Medevac has not suggested discovery is necessary to evaluate the circumstances surrounding the contract.

Section 313 of the Restatement (Second) of Contracts, applicable to government contracts,[111]

which establishes significant hurdles for non-parties seeking to enforce them:

> [A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless
>
> > (a) the terms of the promise provide for such liability; or
> >
> > (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.[112]

Under Section 313, something more than an intent to benefit the non-party must be

demonstrated: the contract must express intent that the promisor will be liable to members of the

general public in the event of non-performance.[113]   Otherwise, third-party beneficiaries of a

---

[111]   See Clifton v. Suburban Cable TV Co., 642 A.2d 512, 515 (Pa. Super. Ct.) (adopting Section 313), appeal denied, 649 A.2d 667 (Pa. 1994), cert. denied, 513 U.S. 1173 (1995); Drummond v. Univ. of Pa., 651 A.2d 572, 578 (Pa. Commw. Ct. 1994) ("[T]he [Section 302] exception to the general principle . . . does not apply where . . . the contract . . . is one with a governmental body.  When a governmental contract is at issue, the test for whether a member of the public is a third-party beneficiary must be strictly applied.") (citing inter alia Restatement (Second) of Contracts § 313), appeal denied, 661 A.2d 875 (Pa. 1995); see also Henry v. Phila. Adult Probation & Parole Dep't, No. 05-4809, 2007 WL 2670140, at *11 (E.D. Pa. Sept. 6, 2007), aff'd on other grounds, 297 F. App'x. 90 (3rd Cir. 2008).

Though the Pennsylvania Supreme Court has not yet adopted Section 313, the Court predicts that, if presented with the question, the Supreme Court would adopt this Section of the Restatement for the following reasons: the Supreme Court has generally adopted a narrow approach to third-party beneficiaries by applying Section 302 only as an exception to the requirement for contractual language evincing intent to create third party beneficiaries; it has applied Section 313's predecessor Restatement provision when addressing beneficiaries of a contract with the federal government, Townsend v. City of Pittsburgh, 119 A.2d 227, 229 (Pa. 1956); and intermediate appellate courts of this state have applied Section 313.

[112]   Restatement (Second) of Contracts § 313(2).

[113]   George v. Boise Cascade Corp., No. 08-2113, 2010 WL 4433113, at *6–7 (M.D. Pa. Nov. 1, 2010) (finding plaintiff was not third-party beneficiary, despite language indicating an intent to benefit plaintiff, because contract lacked intent as to defendant's liability to plaintiff or other beneficiaries)

Government contract are assumed to be merely incidental beneficiaries.[114]  But Medevac has not

pleaded facts suggesting any contractual intent to expose KMHP to liability.[115]

Arguably, Section 313 precludes only claims by members of the "general public," rather

than discrete and identifiable groups of plaintiffs.[116]  Nevertheless, Pennsylvania state courts

appear to apply the Restatement to *all* beneficiaries of government contracts even where the

third-party is a member of a small and specific sub-population that, like Medevac here, benefits

from the government contract more than the general public.[117]  So, too, has the Third Circuit

when applying Section 313 under federal common law.[118]  "The fact that third parties will benefit

more directly from performance of the contract than members of the public at large does not alter

---

(citing *inter alia* A.D.E. Food Servs. Corp. v. City of Phila., No. 95-7485, 1997 WL 631121, at *10 (E.D. Pa. Oct. 9, 1997)).  Courts applying Section 313 under federal common law require similar intent for liability.  See Nguyen v. U.S. Catholic Conference, 719 F.2d 52, 55–56 (3d Cir. 1983); Allstate Transp. Co., Inc. v. Se. Pa. Transp. Auth., No. 97-1482, 2000 WL 329015, at *15–16 (E.D. Pa. Mar. 27, 2000).

[114]   Allstate Transp. Co., 2000 WL 329015 at *16.

[115]   Medevac asserts, without support, that it satisfies any "heightened standard" that applies to government contracts, but it does not explain how its Amended Complaint does so.  Medevac Resp. at 19.

[116]   See Patience A. Crowder, More than Merely Incidental: Third-party Beneficiary Rights in Urban Redevelopment Contracts, 17 Geo. J. on Poverty L. & Pol'y 287, 317–19 (2010).

[117]   See Clifton, 642 A.2d at 514–15 (although contract between state and cable company was intended to benefit incarcerated inmates who paid for the cable service, under Section 313, inmates, like other members of the general public, were not third-party beneficiaries); Drummond, 651 A.2d at 579 (Philadelphia school children were not third-party beneficiaries to a contract between the city and university under which the university agreed to make scholarships available to deserving city children).

[118]   See Nguyen, 719 F.2d at 55–56 (applying Section 313 to contract between federal government and catholic charity under which charity makes direct payments to refugees it sponsors, and finding refugees were not intended beneficiaries where the contract did not expressly make the charity liable to refugees for failure to perform).

their status as incidental beneficiaries."[119]

Accordingly, because the Operating Agreement expressly disclaims third-party beneficiaries and Medevac has neither pleaded nor presented sufficiently contradictory contract language or compelling circumstances that might warrant disregarding that disclaimer, and because Medevac has not pleaded facts sufficient for recognition as a third-party beneficiary of a government contract, the Court will dismiss this Count II without prejudice.

### C.    Motion to Strike.

1.    *Medevac's Request for Damages in the Amount of its Usual and Customary "billed charges" for pre-January 1, 2007 Charges.*

KMHP moves to strike Medevac's requests for relief in the amounts actually billed to KMHP[120] because it asserts that Section 2116 of Pennsylvania's Health Care Accountability and Protection Act[121] entitles Medevac to reimbursement of only its actual costs, not its billed charges.

The Parties dispute whether Section 2116 imposes this limitation.  The provision requires that a "managed care plan shall pay all reasonably necessary costs associated with the emergency services provided during the period of the emergency."[122]  On its face, the statute is ambiguous as to whether it (1) requires payment of only *actual* costs of necessary emergency services provided, or (2) requires payment of billed charges but only for those emergency services that were

---

[119]   See Allstate Transp. Co., 2000 WL 329015 at *16.

[120]   Am. Compl. at 11, 14, 16, 19 (requests for relief in Counts I, III, IV & VI).

[121]   40 P.S. § 991.2116.

[122]   Id.

necessary.  Relying on limited state case law, KMHP argues for the former interpretation.
Medevac, relying on other statutory language, implementing regulations and administrative
interpretations, argues for the latter.

The Court will exercise its substantial discretion in considering motions under Rule 12(f)
and deny the motion to strike references to billed charges because the determination whether
Medevac may recover its billed charges in full (if indeed that is what it is seeking[123]) requires this
Court to resolve a disputed and substantial question of law.  This is not an appropriate use of a
Rule 12(f) motion.[124]  And KMHP has neither suggested nor demonstrated that it will suffer any
prejudice from references in the Amended Complaint to "billed charges."  Upon proper motion
and briefing, the Court will consider, if necessary, whether the state statutory provision limits
Medevac's recovery to actual costs and the implications, if any, of that limitation.[125]

       2.    *Medevac's Request for Attorneys' Fees.*

KMHP moves to strike Medevac's request for attorneys fees because, under Pennsylvania
law, attorneys' fees are unavailable for the state contract claims (Counts II, IV and V), for claims

---

[123]   The Amended Complaint, while referencing "billed charges," does not on its face seek
damages for the full amount billed.  Instead, Medevac asks that KMHP pay "in full its *claims* for
payment of billed charges." See, e.g., Am. Compl. at 11, 14, 19 & ¶ 108.  Medevac asserts that up until
the point at which KMHP began paying only 2% of its billed charges, KMHP had for more than a year
consistently paid 50% percent of the billed charges, without complaint from Medevac.  Am. Compl. ¶¶
36, 99–101. And, indeed, Medevac's claim for breach of an implied-in-fact contract (in the alternative to
its unjust enrichment claim), alleges that Medevac and KMHP agreed to reimbursement at the 50% rate.
Am. Compl. ¶¶ 101, 103.  Thus, it is not clear what measure of damages Medevac specifically seeks.

[124]   Eisai Co., Ltd. v. Teva Pharm. USA, Inc., 629 F. Supp. 2d 416, 425 (D.N.J. 2009) (citing
Tonka Corp. v. Rose Art Indus., Inc., 836 F. Supp. 200, 218 (D.N.J. 1993)).

[125]   Medevac avers that its billed charges approximate its actual costs.  Resp. at 21; Am. Compl.
¶ 27.  This question of fact is likewise inappropriate for resolution on a motion to strike.  Eisai, 629 F.
Supp. 2d at 425.

seeking relief under the federal Declaratory Judgment Act[126] (Count III), and under the state declaratory judgment act (Count VI) except for claims brought against insurers acting in bad faith.  The Court agrees.

Pennsylvania courts follow the "American rule" that attorneys' fees and costs are not recoverable from an adverse party unless a statute expressly authorizes the fees, there was a clear agreement among the parties to permit such recovery, or some other exception applies.[127] Consequently, in breach of contract matters, fees are unavailable absent an agreement between the contracting parties.[128]  Here, Medevac alleges it had, at most, an implied-in-fact contract with KMHP, and does not allege any agreement regarding attorneys' fees as part of the Parties' understanding regarding payment rates or that any statutory exception exists.

Medevac asserts that because it has alleged conduct by KMHP that demonstrates bad faith, it may seek attorneys' fees.  Setting aside the question whether Medevac has alleged bad faith, fee awards for bad faith can be awarded in two situations: (1) bad faith during the pendency of litigation, available under the Court's equitable powers and Pennsylvania statute;[129] and (2) bad faith underlying the conduct that forms the basis for the claim.[130]  Medevac does not seek fees for bad faith conduct during litigation, but rather for pre-litigation conduct.  But fees

---

[126]   28 U.S.C. § 2201 et seq.

[127]   Yellow Transp., Inc. v. DM Transp. Mgmt. Servs. Inc. No. 06-1517, 2006 WL 2871745, at *4 (E.D. Pa. July 14, 2006) (citing Merlino v. Del. Cnty., 728 A.2d 949, 951 (Pa. 1999)).

[128]   Id.

[129]   42 Pa. Con. Stat. Ann. § 2503(6) & (7).

[130]   See Straub v. Vaisman & Co., 540 F.2d 591, 599 (3d Cir. 1976).

awarded for conduct underlying the substantive claim are punitive in nature and thus cannot be awarded when punitive damages are not permitted.[131]  And under Pennsylvania law, punitive damages are not permitted in breach of contract actions.[132]

Medevac's claims for declaratory relief likewise do not permit recovery of attorneys' fees. Neither the federal nor state declaratory judgment statutes expressly provide for an award of attorneys' fees and costs to the prevailing party.[133]  And Medevac points to no exception to the American rule for declaratory judgments, beyond bad faith.  To date, Pennsylvania has recognized only one exception permitting attorneys' fees in actions under the state declaratory judgment statute: where fees are "implemented as supplemental relief to effectuate the declaratory judgment."[134]  Medevac points to no other exception, and this Court's own research has revealed none.

Thus, an award of attorneys' fees would be permissible for only Medevac's Section 1983 claim[135] and, as discussed above, that claim is dismissed.  Accordingly, the Court will grant KMHP's motion to strike Medevac's request for attorneys' fees and costs as such are not

---

[131]   See id. (attorneys fees imposed for pre-litigation conduct are punitive in nature and thus not permissible in securities fraud action where statute prohibits punitive damages) (citing Hall v. Cole, 412 U.S. 1, 5 (1973)); Shimman v. Int'l Union of Operating Eng'rs, Local 18, 744 F.2d 1226, 1232 n.9 (6th Cir. 1984) (because fees awarded under bad faith exception are punitive in nature, impermissibility of punitive damages for claim provides basis for denying fee award).

[132]   Yellow Transport., 2006 WL 2871745 at *4; Johnson v. Hyundai Motor Am., 698 A.2d 631, 639 (Pa. Super. Ct. 1997).

[133]   See 28 U.S.C. § 2202; 42 Pa. Con. Stat. Ann. § 7538.

[134]   Mosaica Academy Charter Sch. v. Commonwealth Dep't of Educ., 813 A.2d 813, 824–25 (Pa. 2002) (fees permissible where insured was forced to seek declaratory relief in response to insurer's bad faith refusal to defend, but not in action for declaratory judgment as to the meaning of a statute).

[135]   42 U.S.C. § 1988.

recoverable under the causes of action Plaintiff pleads.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant KMHP's motion to dismiss Counts I and II, deny KMHP's Motion to Strike references to Medevac's billed charges, and grant KMHP's Motion to Strike Medevac's request for attorney's fees and costs in remaining Counts III, IV, V and VI.

An appropriate Order follows.